HARVEY YALE v. JONATHAN SEELY, JOHN SEELY, and JAMES KENWORTHY.

Standing trees may be the subject of a parol sale, so as to give the purchaser a right to go upon the land to cut them ; and when cut, and left upon the land, they become the personal property of the purchaser.

Trees so cut, and left upon the land, do not pass with the land, in consequence of their having been attached to the soil, but remain, subject to the legal rights of the actual owner, like any other personal property ; and any person purchasing the timber thus cut, and situated, has a legal right to enter upon the land to take it away ; and should the owner of the land attempt to hinder him in the enjoyment of the right, he would be justified in using so much force as might be necessary to overcome the hinderance:

That the court expressed to the jury an opinion in relation to the weight of the testimony, is no ground for reversing the judgment, especially when the court directed the jury to find the fact from the evidence before them, and when the charge did not induce a wrong verdict.

THIS was an action of trespass, in four counts, for breaking and entering the plaintiff's close, on the 5th of February, 1840, and taking away a quantity of poles, and assaulting, beating and wounding the plaintiff. Plea not guilty, with notice of special matter.

On the trial in the county court, the plaintiff introduced evidence tending to prove that, in February, 1839, he purchased of one Russell Bly 40 acres, part of a lot of 114 acres of land, on which 40 acres, the poles in question, were lying, in a pile ; that, by the contract of purchase, the poles, with the other timber, cut down on the land, were to go with it ; that he paid one-half the purchase money, and was, by said Bly, put into possession of the land, and continued in possession to the time of the alleged trespass, but had received no conveyance thereof, though he had, according to the contract, furnished security for the balance of the purchase money, and claimed a conveyance.

The plaintiff's testimony also tended to show that, at the time of the alleged trespass, the defendants, Jonathan Seely and John Seely, came to said close, with teams, for the purpose of drawing away said poles ; that he forbid them to enter for that purpose, and claimed title to the poles, but offered to let them remain till the question of right could be decided ; that, thereupon, the said John Seely, son and servant of the said Jonathan, drove his team upon the premises,

• Addison,
January,
1843.

Yale
*v.*
Seely *et al.*

when the plaintiff met the horses and struck them, whereupon the said John struck the plaintiff, and continued to beat him until forcibly restrained. It appeared that the said Jonathan did not interfere in any way to prevent the violence, but was engaged in pursuing and taking care of the horses; and that, thereupon, the said Jonathan and John took away the poles in question.

To connect the defendant, Kenworthy, with the trespass, the plaintiff offered evidence, tending to prove that, being present, in the employ of the plaintiff, he said, in the hearing of John Seely, when the plaintiff forbid his entering the premises, that he (Kenworthy) would not be stopped by the plaintiff, from taking the poles; and that, after the affray he went away with the Seelys. No evidence was given tending to prove that he was standing by, at the time of the affray.

The defendants introduced evidence, tending to prove, that, previous to the sale of the land in question, by Bly to the plaintiff, Bly sold all the pine timber, fit for sawing, on said 114 acre lot, including the land in question, to one Lathrop Birge, with the right of taking the same off, during the term of three years, which term was unexpired at the time of the injuries complained of; that it was customary, under such a contract for the sale of timber, for the person getting the timber for rafting, to cut boom poles from the land, and that Birge and Bly so understood the contract; that Bly advised Birge to cut the boom poles to raft logs, and that, previous to the sale of the land to the plaintiff, Birge cut pine timber on said lot, and, also, cut the poles in question, principally from a part of the 114 acre lot other than the 40 acres claimed by the plaintiff, and drew, and piled them where they lay when taken by Jonathan Seely.

The defendants further gave evidence tending to prove that, at the time of the alleged trespass, Birge had not taken all the pine timber he was entitled to take, from the 114 acre lot; that, at the time the plaintiff bargained for the 40 acres he was informed by Bly, and that it was a part of the contract between them, that the plaintiff was to have the 40 acres, subject to the right previously conveyed to Birge, and that the poles in question, belonged to Birge, and that Bly did not sell, or pretend to sell, the poles to the plaintiff.

The defendants' testimony further tended to prove, that,

Birge, having concluded not to raft his logs, had sold the poles in question to Jonathan Seely; that the said Jonathan and the said John Seely, his son and servant attempted, for the purpose of drawing off said poles, to enter said close, with teams, by a way which had been used for twenty years, for teams, &c., in the winter, when they were obstructed by the fencing up of the said way, by the plaintiff, whereupon, they entered the close at another place, where they were met by the plaintiff, who struck the horses upon their heads by which they were turned aside, and, thereupon, the said John struck the plaintiff with his whip, upon which, an encounter followed, in which, the plaintiff received injury—which were the breaking of the close, and the beating and wounding complained of—and that the said Jonathan was pursuing the horses during the encounter, and took no part therein.

The plaintiff requested the court to charge the jury that, if they found that the plaintiff purchased said 40 acres of Bly, in February, 1839, and paid a part of the purchase money, and entered into exclusive possession, and continued it up to the time of the alleged trespass, he could not be disturbed in that possession, until some one appeared with a superior title; and that any parol license or right which Birge might have obtained of Bly, could not be set up, against a *bona fide* purchaser of the fee, who fortified his equitable title, obtained by payment of a part of the purchase money, by taking peaceable possession, and continuing it under a claim of title founded on such purchase; and that, said poles being on the land where they were cut, and Birge not being, at the time of the purchase by Yale, in possession of any portion of the premises, the poles would pass to Yale, if it was so intended between Bly and Yale.

The plaintiff, also, requested the court to charge the jury that, if the poles in question were cut under a license to cut such poles as might be needful for booming said logs, Birge would not be entitled to them unless needed for that purpose.

The plaintiff, also, requested the court to charge the jury that, whatever might be the right of property in the poles, the defendants could not justify entering, with force and strong hand against the will of the plaintiff, and taking them away;

ADDISON,
January,
1843.
──────
Yale
v.
Seely et al.

and that the beating of the plaintiff was wholly unjustifiable, and that the plaintiff was entitled to exemplary damages.

But the court charged the jury, in substance, that if they found that a contract was made between Bly and Birge in the winter of 1838, though it was by parol, whereby Bly sold to Birge the pine timber, suitable for sawing, then standing on the 114 acres, and allowed him three years to get it off, and that Birge had entered upon the execution of the contract, on his part, and proceeded to cut the pine timber thus standing, and the poles in question—not only the pine timber, when cut, but also the poles, would become the personal property of Birge, although they should find that it was the understanding of Bly and Birge, at the time of making the contract, that they should be cut for boomage poles, as was testified to be the course or custom of such business, by said Bly; or, in case it was not so understood, at the time said contract was made, if they should find the poles were cut by Birge, by the subsequent assent and advice of Bly, and before his contract with Yale, for the purpose of being used for boom poles, that, then, Birge would not be divested of his ownership in the poles, though, from any cause, he should conclude not to use them for boom poles; and, that Birge would have the right of ingress and regress upon said premises, for the term of three years, in pursuance of such contract, to get off his property; and that, it being admitted that said poles were sold by Birge to Jonathan Seely, he would have the same right of entry, to take them off, that Birge, himself, had.

The jury were further told that a contract for the sale of the land, by Bly to Yale, in February, 1839, would not, of itself, include the poles which Birge might have cut and piled upon the premises; and that, if they found the property of the poles in Birge, under the instructions which the court had given them, it would follow that Bly had no property in the poles, at the time of the contract with Yale, and could transfer no right therein, to Yale, though the jury should find they were included in the contract with Yale.

The jury were further told, that if Birge was the owner of the poles, he would, under his contract with Bly, have the same right to enter the land as against Bly, to take them off within the time stipulated, as he would to take the pine tim-

ber, and that there was no testimony in the case, to prevent Birge from having the same right as against Yale; and that, if Jonathan Seely was the vendee or assignee of Birge, of the poles, he would stand in his place and succeed to his rights; and that if Seely had the right, and was attempting peaceably to enter the premises to draw off the poles, and was obstructed in so entering, he did not render himself guilty of breaking the plaintiff's close, by using so much force as was necessary to remove the obstruction, to enable him to enter for that purpose, and did enter for that purpose.

The jury were also told that, if Birge cut the poles in question, upon the land of Bly, without authority from him, the property of the poles, when cut, would not vest in Birge, but would be in Bly; and that, in that case, he could dispose of them to Yale, so as to give him the right of property.

The jury were further told that, if Jonathan Seely should be found to have the right to enter, and that John Seely, as his servant, in entering upon the premises, to draw off his poles, was forcibly resisted by Yale, and his horses assaulted and beaten, the said John Seely would be justified in using so much force as would be necessary to remove the obstruction, and protect his horses from violence, and no more; and that, if he went beyond that, he would become the aggressor, and would be guilty under the fourth count in the declaration —though courts and juries could not be precise, in such cases, in marking the precise boundaries or limits of such force, but there must be no wanton use of violence.

The jury were told, also, that in the opinion of the court, there was no sufficient evidence against Kenworthy to charge him on any of the counts in the declaration, nor against Jonathan Seely, to charge him on the fourth count, but that the jury would weigh the evidence, and determine for themselves; and that if Kenworthy or Jonathan Seely was present, aiding, assisting, or encouraging John Seely in the commission of any trespass, they would be equally guilty as the said John.

The jury were also told that, if Jonathan Seely had not the right of entry on said premises, and did not own the poles, he, and the said John, would be guilty, on the three first counts, for entering and taking them away.

The jury returned a verdict of guilty, as against John

Seely, and not guilty, as against Jonathan Seely and Kenworthy.

To the charge of the court, and their omission to charge as requested, the plaintiff excepted.

*Linsley & Barber*, for plaintiff.

I. The contract between Bly and Birge for the sale of the pine timber on the 114 acre lot, with the right to enter upon the land for the space of three years to take it off, was a contract for the sale of an interest in land, and within the statute of frauds. 6 East. 602; 6 N. H. 430; 1 Y. & J. 396; Chit. Con. 241. If it was a contract of that nature, and was not executed according to the requirements of the statute, it is to be treated as a mere license, and though partly executed, was so far countermandable by Bly that Birge would be a trespasser for entering upon the lands, after the revocation of the license. The putting of Yale into exclusive possession by Bly under the contract of purchase, was equivalent to a revocation of the license so far as that parcel of land was concerned. Yale's possession was sufficient to enable him to maintain trespass ; and the license to Birge, afforded no justification for an entry upon the land against Yale's will ; and, of course, none to any one claiming under him. Chit. Con. 241 ; 2 Sug. Ven. 75–6 ; *Benedict* v. *Benedict*, 5 Day 469 ; *Cook* v. *Stearns*, 11 Mass. 533. The license was personal in its nature, and not assignable. 3 Kent's Com. 451.

II. The right of Birge to enter upon the 114 acres, was for a particular purpose, and although three years were allowed for its accomplishment, still, if it had been accomplished in six months the right of entry would be gone. So if it had been accomplished as to any particular portion of the 114 acre lot, the right to enter upon that portion would be gone—the owner having the right to follow the cutting of the timber by cultivation. Nor, would Birge or any one under him, have a right, under the contract, to use such portion for piling timber or poles, unless such piling was necessary in the accomplishment of the main object of the contract.

III. Birge had *no right* to cut and take these poles except for boom poles ; and when he abandoned the use of

them for that purpose, all right to enter and take them *under the contract* was gone. Or if he acquired a property in them, by cutting them under an authority from Bly, given subsequent to the contract, he would have no right to enter, to take them off, under the contract. But the court, on this point, in effect, charged the jury, that Birge might have acquired a right of property in the poles, either by the original contract, or by cutting them under a subsequent authority from Bly ; and that, in either case, he would have a right, in pursuance of such contract, to enter for the term of three years, to take them off.

IV. The court erred in instructing the jury that Birge became the owner of the poles in question, by cutting them under an authority from Bly to cut them for a particular purpose, though he abandoned the use of them for that purpose. A person acting under a bare authority or license, must pursue, strictly, the authority, or he acquires no right or interest.

V. But, admitting that Seely was the owner of the poles, he had no right to enter upon Yale's possession by force and against his will to take them off. The general rule of law is, that a man cannot recapture his personal property where such recapture must occasion violence or endanger the peace of society. 3 Bl. Com. 4 ; 1 Swift's Dig. 464 ; 8 Term R. 78. A man cannot justify the breaking open a building or entering upon the grounds of another to reclaim his property, but must resort to an action, except in certain cases ; as, if his property be stolen he may enter the land of another to retake it, 2 Roll. R. 55, 56, 208; or, if one man take the goods of another, and put them on his own land, the owner may enter and take them ; or, if a stranger takes the property of another and places it upon the land of a third person by his assent, the owner may enter and take it off. *Chapman* v. *Thumblethorp*, Cro. Eliz. 329. But even in these cases, the law only justifies a peaceable entry. On the other hand, if goods are put on the land of another by the owner ; or if, having goods in the house of another, he enter and take them, without license, he is guilty of a trespass, even though the entry be peaceable. *Taylor* v. *Fisher*, Cro. Eliz. 246 ; *Heermance* v. *Verney*, 6 Johns. R. 5 ; *Blake* v. *Jerome*, 14 Johns. R.

406. A tenant for years, after his term has expired, cannot enter to remove his goods from the premises.

It would seem that one having a right to the possession of land cannot justify a forcible expulsion of one having actual possession, unless it be a naked possession merely, as that of a tenant at sufferance. *Hyatt v. Wood,* 4 Johns. 150 ; 3 Johns. 239 ; 3 Bl. Com. 147–8, Chit. Ed. ; *Taylor v. Cole,* 3 T. R. 292. In the case of *Hyatt v. Wood,* Spencer, Justice, says : " In an action for the personal injury, ' the defendant who is not in possession, cannot justify an ' entry and the exercise of personal violence ; but in an ' action for an injury done to the land, he may justify the ' force as it respects the possession."

The defendants, in the present case, had neither a naked possession of the premises, nor a title to them, nor a right to the possession. Their only claim was, to enter upon the admitted lawful possession of another for a specific purpose. The plaintiff, on the other hand, according to the principles of these cases, can justify the use of force in defence of his possession. 2 Bl. Com. 92, Chit. Ed. The case of *Richardson v. Anthony,* 12 Vt. R. 273, does not conflict with the principle contended for by the plaintiff. The entry of the defendant, in that case, upon the land of the plaintiff, to get his property, was peaceable. Besides, the court go, expressly, upon the ground that his right of peaceable entry existed because his property was in plaintiff's possession, *by plaintiff's own wrong.*

The doctrine we are combatting, confounds all distinction between a right to *defend* a lawful possession by force, and the right to *assert,* by force, a disputed claim. It will justify a man in committing the very trespasses upon another, for the committing of which, the statute will punish him by fine, and give the party injured a right of action, and treble damages. R. S. chap. 41, § 1–11 ; *Bliss v. Bange,* 6 Conn. R. 78.

VI. The charge of the court was wrong, relative to the rule which should govern the jury, in ·determining whether the battery was excessive, in saying that "courts and juries cannot be precise, in such cases, in marking the precise limits of such force." 3 Bl. Com. 2, 3. Chit. Ed. n. 2. The charge was also wrong, in relation to the liability of Jona-

than Seely and Kenworthy. 6 Bac. Abr. 590 ; *Mason* v. *Silver*, 1 Aik. R.367.

*E. N. Briggs*, for defendants.

1. The timber and poles were cut under a contract with Bly, and became the personal property of Birge.

2. A contract for the sale of the land, or even the absolute sale of it, by Bly to Yale, would not, of itself, include the poles. If the property of them was in Birge, Bly could not give Yale any title to them, even if he had so contracted.

3. If Birge cut the poles, for booming the logs, under the license of Bly, he did not lose his property in them by not using them for that purpose. They became his property when they were cut.

4. Birge had the right of ingress and regress, according to the terms of the contract, for the purpose of taking off his property. The statute of frauds does not declare all contracts by parol to be absolutely void, but only precludes the right to bring actions to enforce them. An act done under a parol contract, even concerning the sale of lands, is valid ; but an executory contract is subject to be defeated. *Downey* v. *Hotchkiss*, 2 Conn. R. 225. It has been held that the sale of standing timber was not within the statute. 1 Lord Raym. 189; *Parker* v. *Stansland*, 11 East R. 362. A parol contract, executed, will protect the parties in their rights under the contract, and equity will even enforce a sale when there has been part execution of the contract. *Crocker* v. *Higgins & wife*, 7 Conn. R. 342.

Yale had no title to the premises. He only entered by a parol license from Bly, and had not such a title that, if Birge was tenant at *will*, he could have determined his license. Birge had a right, by his contract, to enter upon the land ; and, having acquired the property, lawfully, *upon* the land, had a right to enter to take it off. *Richardson* v. *Anthony*, 12 Vt. R. 273 ; *Wells and al.* v. *Banister*, 4 Mass. R. 510 ; *Doty* v. *Gorham*, 5 Pick. R. 487 ; *Ellis* v. *Paige*, 1 do. 47 ; *Whiting* v. *Holmes*, 15 Mass. R. 153 ; *Hyatt* v. *Wood*, 4 Johns. R. 150. It was admitted that Seely acquired all the rights belonging to Birge.

The opinion of the court was delivered by

HEBARD, J. — This case comes before this court upon a bill of exceptions, upon which two questions arise. The first is, did Jonathan Seely own the poles, at the time he entered upon plaintiff's land to take them away ? The other is, if he did own them, had he a legal right to go upon the plaintiff's land for the purpose of removing them, without the plaintiff's permission ?

The first is a mixed question of law and fact, and, under proper direction from the court, must be settled by the jury. The court instructed the jury, " that if they found that a ' contract was made between the said Bly and the said Birge, ' in the winter of 1838, though it was by parol, whereby Bly ' sold to Birge the pine timber, suitable for sawing, then ' standing on the 114 acres, and allowed him three years to ' get it off ; and that Birge had entered upon the execution ' of the contract on his part, and proceeded to cut the pine ' timber thus standing, and the poles in question, — not only ' the pine timber when cut, but the poles, also, would become ' the personal property of Birge, although they should find ' that it was the understanding of Bly and Birge, at the time ' of making the contract, that they should be cut for boom- ' age poles, as was testified to be the course or custom of ' such business, by said Bly ; — or, in case it was not so un- ' derstood at the time said contract was made, if they found ' they were cut by the subsequent assent and advice of Bly, ' and before his contract with Yale, by said Birge, for the ' purpose of being used for boom poles, that then Birge ' would not be divested of his ownership in such poles, ' though from any cause he should conclude not to use them ' for boom poles ; and that Birge would have the right of ' ingress and regress, upon said premises, for the term of ' three years, in pursuance of such contract, to get off his ' property ; — and that, it being admitted, on trial, that said ' poles were sold by Birge to Jonathan Seely, he would have ' the same right of entry, to take off the poles, as Birge him- ' self had." The inquiry upon this point is directed to the charge of the court ; and if the charge was correct, the finding of the jury settles this part of the case. When Birge had cut these poles, pursuant to an understanding of Bly that he should and might cut them, he had acquired an in-

terest in them of which he could not be divested, unless by his own consent, or through some negligence on his part. The license to cut these poles, if gratuitous, might be revoked at any time before they were cut, but not after. New rights have been established by the act of cutting. The property itself has changed in character, and changed its ownership. The fact that Birge was permitted to cut them for *boom poles* has nothing to do with the ownership of them, so long as Bly had no interest in, and was, in no way, affected by the use to which they were to be put. Birge had permission to cut them for his own exclusive use and benefit; and whether, after cutting them, their use and destination were changed, was a question in which Bly was not interested, and had no concern, and was a fact upon which the ownership of the property could not depend.

It is further contended in argument that standing trees are a part of the soil; and that, although these poles were not standing trees at the time, still, being upon the land of the original owner, they are to be treated as if they had not been cut, and had passed with the land to the plaintiff. The unsoundness of this argument will be apparent, when we examine to see what it is that constitutes an article of property, personal in its character, when, under other circumstances, it savors of the realty. The *character* of property that is not *actually* attached to the soil, depends upon the situation in which it is, and the use to which it is put. The same material, if used for one purpose, becomes a part of the realty; but if used for another purpose, it is personal estate. These poles, lying in a pile, are no more a part of the soil upon which they rest, and are no more attached to it by any use to which they were designed, than boards lying in a mill yard. They, both, were once attached to the soil; but, having been severed and removed, the character of the property is changed. Buildings are, ordinarily, attached to the soil upon which they are erected, permanent in their location, and their use and the land upon which they stand is identical; and they are, therefore, regarded as real estate; but the materials of which they are composed, before being incorporated into the building, were personal property. And the same may be said of fences. But the cases referred to in Massachusetts and N. York seem to suppose that even

buildings may be erected under such circumstances as to partake of the character of personal property.

These poles, being personal property, would no more pass with the land than any other article of personal property that should happen to be upon it. And, being the property of Birge, he could sell them, and convey as good a title as he himself had. And the case finds that Birge did sell them to Jonathan Seely, one of the defendants.

This, then, brings us to the consideration of the other question : namely, had Jonathan Seely a right to enter upon the plaintiff's premises to take away these poles ? We have already seen that Birge was the lawful owner of the poles, and sold them to the defendant, Jonathan Seely ; so that, whatever right Birge had to take them away passed to Seely, who, in that respect, stood in the same relation to plaintiff that Birge did to Bly. In relation to this right, I am aware that there is some apparent conflict of authority ; but it is believed that it is more *apparent* than *real.*

It is laid down in Swift's Digest that " a man may enter ' upon the land of another to take away his tree that has ' fallen upon his land." " He may go upon the land of an- ' other to cut, and carry away, trees which he has bought, or ' corn to which he has a right ; for, whenever the law grants ' a right, it grants whatever is necessary for the enjoyment ' of it." If the law gives the right to a man to do a certain act, it would be a solecism to say that in doing that act he would be a trespasser. But it is said that the plaintiff forbid the defendants' going upon his land. But if the defendants had a right to go upon plaintiff's land, what right had the plaintiff to hinder or forbid them ? These are rights which are opposed to each other, and both cannot exist at the same time. But it is insisted that the party claiming this right is entitled to the enjoyment of it only when it can be done in a " peaceable manner." This is a qualification that is sometimes affixed to the right of *recapture* and *reprisal,* and applies to the regaining of personal property that has been wrongfully taken or withheld ; and the law recognizes the right only with that qualification. But it is not so with regard to a *right* to enter upon another's land. If it is my right, the law will protect me in the enjoyment of it, —and the person who attempts to hinder or obstruct me is the

aggressor, and the first in the wrong. A right to enter upon the land of another for a particular purpose, in many respects is like a right of way across another's land, or the right to enter upon the land of another to remove a nuisance that he has placed there. It was settled, a long time since, that if A. sell to B. land that is surrounded by the land of A., B. has a right to pass over the land of A. This is a right incident to the sale, for the enjoyment of the thing purchased. It is a maxim of the law that if one man grants to another any thing, he impliedly grants every thing necessary for the enjoyment of it.

We think all these principles apply to this case. When Bly sold the timber to Birge, and permitted him to cut the poles, he at the same time gave him authority and license to take them away. When Birge, by such permission, had cut the poles, they became his personal property, and he acquired a perfect right to enter upon the land and take them away. This right was not confined to the person of Birge; he might send his servant to take them, or he might sell them, and the right would pass, with the property, to the purchaser. Jonathan Seely, then, being the purchaser of this property, became invested with the right to take it away. The plaintiff, when he took possession of the land, took it subject to this right, which was both *prior* and *paramount* to the plaintiff's title to the land, and which the plaintiff could not revoke or impair. I apprehend this principle was recognized in the case of *Goodrich* v. *Hathaway*, 1 Vt. R. 485. In that case, the plaintiff was permitted to maintain his action of *quare clausum fregit* against the defendant for cutting and carrying away a pine tree standing upon the land of one Hawkins, which the plaintiff had bought; and the only interest Goodrich had in the land was the right to enter upon it, and take away this tree. It would be a strange kind of legal logic to say that he could maintain trespass against a third person for going upon that land, if he could not insist upon the right to go upon it himself. But this doctrine is not peculiar to this case. The same doctrine is laid down in 1 Swift's Dig. 512, and other elementary writers.

These poles being the property of Jonathan Seely, and he having the right, by himself and his servants, to enter upon the

ADDISON,
January,
1843.

Yale
v.
Seely et al.

land where they were, to take them away, he and his servants might as well protect themselves in the enjoyment of that right as any other. And, if the defendant could only enter upon the enjoyment of the right in a peaceable manner, as the expression is sometimes used, and understood, it would cease to be a right, whenever the plaintiff chose to dissent from it. It is difficult to see how a *right* in one man can be taken away, legally, by the wrong act of another. When the plaintiff attempted to hinder the defendants from going upon his land to take away the property, he became the first *tort-feasor*, and committed the first assault upon the defendants, by stopping and striking the horses.

The case of *Richardson* v. *Anthony*, 12 Vt. R. 273, is very properly relied upon as authority. That is a case, in which the defendant was sued for going upon the plaintiff's land, to reclaim his property,—and the Chief Judge, in delivering the opinion of the court, recognizes the doctrine laid down in Hammond's Nisi Prius, 153, "that the owner of goods and chattels has authority, by law, to enter the land of another, upon which they are placed, and remove them, provided they are there without his default." The authorities seem to make something out of the manner in which the property comes to be upon the premises of another,— and, perhaps, very justly—but the current of the authorities, recognize the right of the owner of personal chattels, to go upon the land of another to obtain them, when they are there by permission of the owner of the land. In the case of *Chapman* v. *Thumblethorp*, Cro. Eliz. 329, the court held " that when the defendant's beasts are taken from him by wrong, and are not out of his possession by his own consent, he may justify the taking of them, wherever he can find them."

In *Taylor* v. *Waters*, 2 C. L. R. 140 ; and *Wood* v. *Manley*, 39 C. L. R. 19, the same principles are recognized which govern this case. The notion that has obtained in connexion with the subject, was, probably, derived from the old English statute, against *forcible entry and detainer*, from which most of the modern statutes, on that subject, have been taken ; and it is believed that no *civil action* has been sustained, even under those statutes, where the person, making the *forcible entry*, had the right to the possession.

Indictments have been sustained for the breach of the peace, —but, before those statutes, at common law, indictments would not lie. The case of *Hyatt* v. *Wood*, 4 Johns. 150, is a very strong case in illustration of that principle. In that case the owner of the land, was justified in taking forcible possession of the premises, against a man who was peaceably in possession. In the present case, the defendants seek to be justified in attempting to do that in a peaceble manner, which they had a legal right to do, and which they would have done peaceably, if the plaintiff had not committed the first trespass, and the first breach of the peace. The case of *Cook* v. *Stearns*, 11 Mass. 533, was determined upon a demurrer to defendant's plea, and the court sustained the demurrer, on the ground that the defendant did not set up such a right, as would authorize such an act. The court made a distinction between a license unlimited, and indefinite, and one to do a particular act, and limited as to time. And they said, " the distinction is obvious, that licenses to ' do a particular act, do not in any degree trench upon the ' policy of the law, that requires bargains respecting the title ' and interest in lands to be in writing. They amount to an ' excuse for an act, that, otherwise, would be a trespass ; but ' a permanent right to enter upon the land of another, for a ' particular purpose, ought to be in writing." " A license to ' do a particular act is revocable, when executory, unless a ' definite time is fixed, but irrevocable when executed." We think the principle relied on by the defendants, is fully sustained by this case.

*Benedict* v. *Benedict*, 5 Day. 464, was an action of disseisin, and the principles discussed are not very analogous to the case ; and the same may be said of the case, *Heermance* v. *Vernoy*, 6 Johns, 5. The *right* of entering upon the land of another was very little discussed. No justification was pleaded, and the case finally turned upon the rejection of testimony.

In the case of *Blake* v. *Jenner*, 14 Johns. 406, the case turned upon another point,—although the court intimated that the act complained of, would be a trespass ; but the main point was very little gone into.

This disposes of the two principal points in the case ; and, according to the view we have taken of it, all the plaintiff

was entitled to recover, was for the excess of the beating; and this, under the direction of the court, the jury have found for him, against John Seely, one of the defendants.

The plaintiff complains of the charge of the court, in relation to Jonathan Seely and Kenworthy; but it is of little importance, further than it affects the cost, whether the judgment is against all the defendants, or only against one, so long as he has recovered a judgment against the one, from whom he received all the actual injury. The principal ground of complaint is, that the court ventured an expression of opinion in relation to the proof; but this cannot be a sufficient reason for granting a new trial, so long as the court directed the jury to find the fact, whether Jonathan Seely and Kenworthy were aiding and abetting the trespass. The jury were directed to find the fact, from the evidence in the case, and being so directed, we are not to presume, that they disregarded their oaths, to follow what they imagined to be the opinion of the court, when that opinion conflicted with their own judgment of the weight of evidence.

The plaintiff also objects to the charge of the court in relation to the excess of force, that the jury might find to have been used. The court told the jury, "that John Seely 'would be justified in using sufficient force to remove the 'obstructions, and protect his horses from violence, and 'no more,—and that if he went beyond that, he would be 'guilty under the 4th count." Under that charge, the jury found John Seely guilty, and assessed the damage, as it was their duty to do; and the *amount* was a matter resting entirely in their discretion. This direction of the court we regard as being unobjectionable, and was all that the plaintiff had a right to claim. But that part of which the plaintiff complains is the following:—The court told the jury that, " courts and juries cannot be precise in marking the precise limits or boundaries of such force." But for this we do not see any cause for granting a new trial, even if it was not correct, because it did not induce a wrong verdict; for, notwithstanding the charge, he obtained such a verdict as he sought. Upon the whole we are satisfied with the ruling and charge of the county court, upon all the points reserved, and with the result of the trial; and the judgment of that court is affirmed.