## TIMOTHY DUSTIN *v.* JOHN COWDRY AND OTHERS.

*Forcible entry by person having title and right of entry. Penalty under statute. Right of disseizee to maintain trespass. Entry by landlord after expiration of term.*

Under the statute of this state, of forcible entry and detainer, the party forcibly put out of the posession, even by him who has title and right of entry, is entitled to restitution, and may subject the disseizor to punishment by fine, and may sustain an action of trespass upon the statute, and recover three fold damages for the expulsion and detainer.

Dustin *v.* Cowdry et al.

And the party thus ejected may, if he so elect, waive the penalty under the statute, and sustain an action of trespass *qu. cl.* against such disseizor, and the defendant will not be permitted to set up title in himself, as a defence to such action.

Under that statute, if a tenant at will of a dwelling house hold over his term, and thereupon, after due notice to quit, the landlord forcibly enter and eject him, his family and effects, from the house, the entry is unlawful, and the tenant may recover his damages therefor in an action of trespass *quare clausum fregit;* — and it will make no difference, that the tenant had agreed to leave by a certain day named, and that, if he did not leave, the landlord might put out him and his effects in any way he chose.

TRESPASS. The suit was commenced in the county of ORANGE. The declaration contained three counts,—first, for breaking and entering the plaintiff's dwelling house and injuring his goods therein,— second, for breaking and entering the plaintiff's dwelling house and forcibly expelling him and his family therefrom,—third, *de bonis asportatis*, in common form. Plea, the general issue, with notice of special matter of defence. Trial by jury, December Term, 1849,— REDFIELD, J., presiding.

The dwelling house in question was the property of the Methodist Episcopal Church and Society in Tunbridge. The plaintiff had, by permission, for short periods, from time to time extended, occupied the house for nearly a year. When the term was last extended, the plaintiff agreed, that he would leave by a certain day named, and that, " if he did not, the society might put him and his effects out any way they chose." The day passed, and the plaintiff continued to hold over, without manifesting any intention to leave the premises. The defendants, who were members of the board of stewards of the society, and its legally constituted agents, with the concurrence of the other members of the board, excepting one, who had removed without the limits of the society, went to the house and requested the plaintiff to leave, and gave him to understand, that they should put him out, if he did not. The plaintiff's family at the time consisted of his wife, who was in a feeble state of health, and six children, one of whom, the youngest, about one year old, had been from her infancy and then was sick, having fits frequently. This was on the twenty first of March, 1848, and the weather was uncomfortable, and to some degree inclement, perhaps, by reason of

wet, snow and mud. The plaintiff not leaving the premises, the defendants proceeded to strip the house, as high as the windows, of all covering and inside finish; and finding that the plaintiff's family still insisted in occupying it, they went in forcibly, and insisted upon their leaving immediately, and finally put them out into the street, by force, and all their household effects, using no more force, than was necessary for accomplishing the purpose. The plaintiff, with the aid of his friends, made strenuous resistance against leaving the house, and the defendants, in order to remove the plaintiff's family, were compelled to resort to a considerable degree of force, which they applied in the most quiet and gentle manner; and it appeared, that whatever riot and uproar occurred was in consequence of the unnecessary and unreasonable resistance of the plaintiff and his family and friends, in carrying out a determination to keep possession of the house.

The court charged the jury, that if the plaintiff's term had expired, and he, upon reasonable request, refused to leave the premises, the defendants, as the agents of the society, had the right to put out the plaintiff and his family, and to use all the force that was necessary for obtaining the possession; and that the stewards, by virtue of their office and the authority it invested in them, had the right to obtain possession of the premises on behalf of the society, and in so doing to use all necessary force against the plaintiff and his family, without any express authority from the society; and that the consent of the other members of the board of stewards to the acts of the defendants, or a majority of them, might be presumed by the jury from their silence, or acquiescence in the doings of the defendants professedly on their behalf and for their benefit, and from the other circumstances in this case, without any express proof to that effect.

Verdict for defendants. Exceptions by plaintiff.

*J. S. Marcy* for plaintiff.

The right to expel a tenant by physical force has no existence in this state. The party having the right of possession must obtain it by the use of some of the remedies provided by law,—especially where, as in this case, the tenant is in under lease, although the term is expired and he neglects to quit. *Beecher* v. *Parmele et al.*,

XXIII.    80

Dustin *v.* Cowdry et al.

9 Vt. 352. 4 Kent. 117. *Hyatt* v. *Wood,* 3 Johns. 239. *Sampson* v. *Henry,* 11 Pick. 379. *Ellis* v. *Paige,* 1 Pick. 43. *Moore* v. *Boyd,* 11 Shep. 242. *Brock* v. *Berry,* 13 Law Rep. 89. 13 Pick. 36. Rev. St. 236, 237. The doctrine of the charge licenses the use of as much force, of any description, as may be sufficient, in any case, to effect the expulsion of the tenant and his family. The practical consequences of such a principle are too barbarous and revolting to be tolerated in any civilized country, save only such as make the subjection of the many to the will and desires of the few an ingredient in their social compact. The reasons for the decisions in England, recognizing this doctrine, are indeed inscrutable. They are in direct contradiction to the doctrine laid down by Blackstone. 3 Bl. Com. 145–151. And it is still more strange, that the English courts should have continued to regard this doctrine as civil (in contradistinction to criminal) law, after the enactment of the statute 5 Richard II, c. 8, making all forcible entries penal and punishable by imprisonment. 4 Bl. Com. 103, 104. The statutes of this state impose fine for forcible entry, or detainer. Rev. St. 235, § 1. And a possession gained by force, and in violation of the statute against forcible entry and detainer, is unlawful, though the disseizor has the right of possession; and the party thus expelled may maintain an action and recover for the injury occasioned by such expulsion. *Hillary* v. *Gay,* 25 E. C. L. 398. *Newton et ux.* v. *Harland,* 39 Ib. 581.

*Hebard & Martin* for defendants.

It was a part of the contract, that the defendants might put the plaintiff out, and his effects, in any way they chose. At most he was but a tenant at *sufferance,* and might lawfully be dispossessed by the landlord by force, if, upon request, he refused to leave. 4 Kent 118. *Jackson* v. *Stansbury,* 9 Wend. 201. *Hyatt* v. *Wood,* 4 Johns. 150. *Taunton* v. *Costar,* 7 T. R. 431. 8 E. C. L. 280. 14 Ib. 59. *Beecher* v. *Parmele et al.,* 9 Vt. 352. The landlord may have an action of trespass against the tenant holding over. *Catlin* v. *Hayden,* 1 Vt. 375. A party entitled to possession, as against a wrong doer, may use all the force necessary to obtain it. *Yale* v. *Seeley,* 15 Vt. 221. *Hodgeden* v. *Hubbard,* 18 Vt. 504. *Meader* v. *Stone,* 7 Met. 147. *Richardson* v. *Anthony,* 12 Vt. 273.

If the landlord may enter and take possession of the premises, it must follow, as a necessary consequence, that he has a right to the enjoyment and may expel a wrong doer. The plaintiff did make strenuous resistance, which brings the case within the cases of *Yale* v. *Seeley* and *Hodgeden* v. *Hubbard*, above referred to; and the case finds, that no unnecessary force was used.

The opinion of the court was delivered by

REDFIELD, J. We entertain no doubt, that such a principle of law, as that for which the defendants contend, and which is embraced in the charge of the court in this case, did exist in England from the time of the Norman Conqueror, until the statute of 5 Richard II, ch. 8, of Forcible Entry and Detainer,—a period of nearly three hundred years. And it might have existed prior to the Norman conquest, but I find no authentic account of its existence prior to that date, and it seems to us far more in accordance with the social polity of the Conqueror and his immediate descendants, than with any other, which ever obtained in that country. It is a principle more in conformity with a tenure of land of some superior, or over lord, whose mere will is the law of the tenure, converting the tenant into a mere menial, or dependent, than with the tenure of free and common socage, where the tenant is absolutely, as really and to all intents, as much a freeman, as the landlord, and where the rights of the humblest are as much respected, and as readily and as minutely vindicated by the authority of the state, both judicial and executive, as are those of the most powerful. And it is certain, we think, that such a mode of reducing *rights of action* to possession is more suited to the turbulence and violence of those early times, when no man, whose head was of much importance to the state, felt secure of retaining it upon his shoulders for an hour, than to the quiet and order and general harmony of the nineteenth century. But that such was the ancient common law of England we have the authority of Hawkins, vol. 1, ch. 64, sec. 1, and of many others.

But as men advanced towards equality, and claimed to have their rights respected and guarantied to them, and more carefully defined, this state of the law became intolerable, and was among the first to be abrogated by Parliament. The resistance of the English barons at Runymead extorted from King John the *Magna Charta* of Eng-

Dustin *v.* Cowdry et al.

lish and American liberty, and that of Wat Tyler and his associates, to Richard II, accomplished scarcely less for the peace, quiet, and good order of the realm, when it compelled the king and the extensive landholders to consent, in parliament, to the statute against all forcible entry into lands, even by those having good title, and, as a correlative, compelled those, whose titles had expired, to make summary surrender.

The language of Sergeant Hawkins shows the object and necessity for this statute;—" But this indulgence of the common law" [permitting forcible entries into lands, withheld from the rightful proprietors,] " having been found, by experience, to be very prejudicial to the public peace, by giving an opportunity to powerful men, under the pretence of feigned titles, forcibly to eject their weaker neighbors, it was thought necessary, by severe laws, to restrain all persons from the use of such violent methods *of doing themselves justice*,"—referring to the statute 5 Richard II, against forcible entries, &c. But what would be the benefit of such a statute, if every one could disregard it without detriment to his civil rights? The redress, which a weak tenant would be likely to obtain against a powerful landlord, by a public prosecution, would prove a most tantalizing mockery.

The very words of our statute, copied almost literally from the English statutes, show the sense of the legislature upon this subject; —" No person shall make any entry into any lands, or other possessions, but where entry is given by law; *and in such case, not with strong hand, or with multitude of people, but only in a peaceable manner*;" and if any one do either, it is provided, that he shall be fined, restitution shall be made to the one thus thrust out of possession, and he shall be entitled to recover treble damages. All this is so explicit, as scarcely to admit of question; and it seems wonderful, that any doubt should ever have arisen, especially when we advert to the occasion and the object of passing the English statute upon this subject. And, as is said by ERSKINE, J., in *Newton v. Harland*, 1 Man. & Gr. 644, [39 E. C. L. 581,] " It seems remarkable, that a question so likely to arise should never have been directly brought before any court *in banc*, until that case" (1840.) We can only conjecture, that the reason must have been, that the very great explicitness of the statute, and the manifest absurdity of the

old common law rule upon the subject, as a rule of law, in regard to the title and possession of real estate in a free country, must have so commended itself to the minds of the English people, that no man was found to possess sufficient hardihood to attempt so bold an innovation until these days of speculation and experiment.

But if the point had never been decided by the English courts, it is certain, there was a very general concurrence and consent among all their law writers and judges upon this subject. In *Regina* v. *Dyer*, 6 Mod. 96, it was held, that one, who, without right, entered into land and expelled the possessor, by force, was liable to indictment, at common law, and so are all the subsequent cases. "But," say the court in that case, "*the statute forbids force* in entering, or detaining, *even where the entry is lawful.*" This, it will be recollected, is as early as 2 Queen Anne. And Littleton, in Co. on Lit., book 2, chap. 49, § 431, takes the same view of the statute, if we understand the author's meaning. The editor, having in mind some modern gloss perhaps, suggests, that Littleton may have misapprehended the true import of the statute. But in Fitzherbert's *Natura Brevium*, which is one of the earliest commentaries upon the subject, it is said, "If a man entereth with force into lands and tenements, to which he hath title and right of entry, and put the tenant of the freehold out of those lands, or tenements, now he who is so put out by force shall not maintain an action of forcible entry against him, who had title or right of entry, because that entry, at common law, or the statute of Richard II, is not any disseizin of him; but he may indict him for his entering by force, and by this indictment he shall be restored to his possession again; and this is by the statute 8 Hen. VI, ch. 9. And in *this* action of forcible entry, under the statute of Henry VI, the plaintiff shall recover treble damages, as well for the occupying of the lands, as for the first entry." Lord HALE, in his note upon this passage, says,—"He shall not maintain an action on the statute of Richard II, but may by the statute of Henry VI; for upon examination it will be found, that the statute of Richard II gave no action to the party aggrieved by being forcibly put out, and no power to the justices to make restitution, but only to fine the offender. And this difference, between the statute of Richard II and that of Henry VI, which Littleton and Fitzherbert do notice, and which Mr. Thomas did not advert to in his

note to Co. Litt., but which Lord Hale did in Fitzherbert, seems to have been the entering wedge to most of the modern blundering upon this subject, for we scarcely feel justified in calling it by a milder name. But this kind of spirit, when it has once entered into the law, is not easily cast out; since every successive writer is likely blindly to copy the same error, without examination, and thus give it the sanction of his own authority.

But the statute of 8 Henry VI did give both the power of making restitution of possession, and treble damages to the party thus thrust out; and in this respect our statute is the same. It is under the statute of Henry VI, that Fitzherbert, Littleton and Lord Hale say, the party forcibly put out, even by him who has title and right of entry, is entitled to restitution, and to an action for treble damages. This is the natural import of the statute of Henry VI, and the only rational construction, which can be put upon our own present statute against forcible entry and detainer. The party guilty of a forcible entry is liable to fine, to have the possession restored, as before, and to pay treble damages, notwithstanding he may make good title to the premises. The title to the land and the right of possession is not important in any proceeding, under the statute, when the entry is forcible and with strong hand, or multitude of people. This point is expressly decided in *The People* v. *Leonard,* 11 Johns. 504. Thompson, Ch. J., says,—" If the lessee shows himself in the peaceable possession of land, and that he was finally dispossessed, it will be sufficient to entitle him to recover possession. And the defendant will not be permitted to set up title to defeat it,"—as we have seen he might under the statute of Richard II; Fitz., *ante.* " He must," continues Ch. J. Thompson, " restore the party to his possession, wrongfully taken from him, in the first place." In *The People* v. *King,* 2 Caine 98, Kent, Ch. J., says, " The defendant must give up the possession irregularly obtained, put the complainant *in statu quo,* and then proceed legally to the question of title."

Indeed, all the English common law writers and judges agree, that under the statute of Henry VI, which is like our own in this respect, the party thus forcibly expelled is entitled to restitution of the possession, even against him who has good title and right of possession. But they seem to have confounded what Littleton, Fitzherbert and Lord Hale say in regard to one, who has no title, maintaining

Dustin *v.* Cowdry et al.

an action, for being thus forcibly expelled, against him who had the title and right of possession, and to have understood these writers as speaking of the statute of Henry VI ;—or rather they seem not always to have noted, that these writers, who were almost contemporary with the statute, do say, that under the statute of Henry VI the party aggrieved may have his action for treble damages, against the party expelling him by force, without regard to the title, or right of possession. And such, it seems to us, is the necessary import and the only rational construction of our own statute upon this subject. But under the first English statute of Richard II, no such remedy was given to the party. Hence in many elementary writers we shall find it said, generally, that no action will lie against the party making a forcible entry, who has good title to enter and possess, which seems to have been inadvertently copied from the early writers upon this subject, who evidently referred only to the statute of Richard II, and which, with all humility, it is submitted, could have no just application to the statute of Henry VI. It may have been considered, by some, that the party, by bringing trespass *qu. cl.*, waived the benefit of the statute, and put the right of possession in issue, and that may be a sound view, or it may not; we shall have occasion to examine it farther hereafter. It has no necessary connection with the statute remedy which is explicitly given to the complainant, in all cases, where he prevails in his complaint ; and to entitle himself to judgment he need, one would suppose, only show the judgment of the court upon the proceeding for forcible entry. Such seems very clearly to be the import of the statute. Rev. St., ch. 41, sec. 11. " The complainant of any forcible entry and detainer as aforesaid, *who shall recover against the party complained of*, as aforesaid, shall have right to treble damages, with costs of suit, by an action of trespass, against the offender." Thus showing, as clearly as language could, the purpose of the act, to give an action of trespass for treble damages, whenever the party should be adjudged guilty of a forcible entry or detainer. So that, had the present plaintiff elected to have proceeded under the statute, there can be no doubt, he might have subjected the defendants to punishment by way of fine, obtained restitution of the possession, and sustained an action of trespass, and recovered three fold damages for the expulsion and detention. And if such be the undeniable rights of the parties, under the statute, it

Dustin *v.* Cowdry et al.

is difficult to see, why, if the party waive all penalty under the statute, he may not sustain trespass *qu. cl.* against the defendants, the same as against any other wrong doers. Their right to possession gave them no more right to enter in that manner, than if they had been mere strangers, and if, while they were violating an express statute, subjecting themselves to criminal prosecution and to be turned out of possession, they would not thereby be estopped from setting up title in themselves, for the purpose of legalizing their illegal conduct, it is because this case forms a most remarkable exception to all others of a similar character.

But many *dicta,* to the effect, that a *party thus* expelled, could sustain no action of ejectment, or trespass *qu. cl.,* against him, who had right of entry, will no doubt be found in the books, and the reason assigned is, that the tenant's title had expired. And such a rule is applicable enough, under a statute like that of Richard II, which only provided a fine against the party, for the breach of the peace. But under that of Henry VI, and our Revised Statute, where the party is entitled to restitution of possession and to an action of trespass for treble damages, the more rational view undoubtedly is, that the party thus unlawfully expelled may have trespass *qu. cl.* for the damages thus sustained by him. For the entry and the occupancy are both violations of the law, infringements of the rights of the one in possession, and for which he is entitled to redress, by way of damages and restitution. The mode of redress must, then, be regarded as mere form. The substance of the thing is, to recover for his loss by being forcibly put out of what was, for the time, his castle, (see *Semaine's case,* 5 Coke 91 ; Bac. Ab., Tit. Trespass 587,) his dwelling house, the personal injury, if any, the fright to himself and family, and the injury to health and comfort, and the indignity and insult. These may be reached by separate actions of assault and battery, in favor of each member of the family, and by trespass *de bonis,* as to the goods; but the far more appropriate redress seems to be trespass *qu. cl.* And the recent English cases seem to incline to that view. In *Hillary* v. *Gay,* 6 C. & P. 284. [25 E. C. L. 398,] which was trespass *qu. cl.* before Lord LYNDHURST, then Chief Baron of the Exchequer, the facts were very similar to the present case. The plaintiff had occupied a tenement of the defendant, the term had expired, and there was some proof, that the plaintiff had prom-

ised to quit, before a certain day, then long past. " The defendant procured a number of Irishmen to go to the house, and after getting the plaintiff to go away, by sending a boy to tell him his master wanted him, the Irishmen entered the plaintiff's rooms and turned the plaintiff's wife into the street, and put the plaintiff's furniture out at the window." The counsel having cited *Turner* v. *Meymott,* 8 E. C. L. 280, as in point, Lord LYNDHURST said, " there the tenant had gone away, and had not left his family in possession. The tenant was in that case out of possession, and there was no one in possession." And in summing up he says,—" even if the plaintiff had promised to leave at a particular day, the conduct of the defendant is unjustifiable. If the defendant had a right to possession, he should have obtained that possession by legal means." The plaintiff had a verdict, with fifty pounds damages, which seems to have been acquiesced in by the party in fault. The learned Chief Baron, who had spent his life in the purlieus of Westminister Hall, in the study and the practice of the law, and nearly a quarter of a century upon the bench of one or other of the superior courts there, entertained no doubt, that the plaintiff there was entitled to maintain trespass *qu. cl.* and to recover exemplary damages. But we not seldom hear it asserted, upon this side of the Atlantic, by those comparatively novices in the profession, that it is absurd, that one shall be held liable to an action of trespass, for entering forcibly into possession of his own property, just as if it were a clear point, that one might take possession of his own property, in his own way, even at the expense of violating all laws, human and divine. And such a doctrine may have received some countenance from the decisions of this court. But it is, in my deliberate but humble judgment, a most dangerous doctrine, come from whatever elevated source it may. And the sooner it is discountenanced by the courts, the better for the peace and quiet of the state. It is a doctrine, which has grown up altogether, so far as I know, within the last twenty years, and has never, since the period of three hundred years subsequent to the Norman conquest, received the least countenance in England, or any where else, out of this state, if we except only the state of New York,—I mean, to the extent of justifying such force, in every civil action. It may have been often said, that such a possession was legal ; but

XXIII.     81

to that extent even, we have seen, that the doctrine is not maintainable.

But the case of *Hillary* v. *Gay* received, in the late case of *Newton* v. *Harland*, the decided approbation of the common pleas, after two arguments, and great consideration, so late as 1840. The action was trespass for an assault and battery upon the wife. The facts were,—the plaintiff hired rooms of the defendant for six months, the term expired, the defendant attempted to make distress, and the plaintiff's wife locked the doors, and the defendant employed a blacksmith to pick the locks. "The same evening Mrs. Newton was requested to leave the rooms, and having refused, Harland again entered the rooms, accompanied by four or five persons, and compelled Mrs. Newton, her children and servants, to leave the apartments—Harland himself laying hold of Mrs Newton's arm and leading her out." The case was argued by distinguished counsel on both sides,—on the part of the plaintiff by Wilde, the late Chief Justice of the common pleas, and at present the Rt. Hon. Lord Truro, Lord High Chancellor of England, and subsequently by Mr. Sergeant Warren, alike distinguished for his learning in the profession, and his beautiful taste and great excellence as a writer ; and, among other eminent names opposed, by the present Mr. Justice Cresswell of the common pleas.

The court, in delivering their opinions *seriatim*, at considerable length, approve fully, and some of them in form, of the views ex-expressed by Lord LYNDHURST in *Hillary* v. *Gay*. Ch. J. TINDALL said, on the first argument,—"This case involves an important question, namely, whether a landlord has a right to enter, and expel, by force, a tenant, who holds over, after his term has expired. I should have great difficulty in agreeing to the affirmative of that proposition, for I do not see, how the defendant can justify the expulsion of the *female plaintiff*, under a possession obtained by an act, which is itself criminal." The only ground, upon which sound lawyers have ever attempted to argue this question, on the part of the landlord, is to claim, that, by the entry, he becomes possessed of the premises, and the tenant becomes the *tort feasor*, and *intruder*. And this may be true of a vacant possession, as was held in *Turner* v. *Meymott*, 8 E. C. L. 280, or where the landlord enters upon another

Dustin *v.* Cowdry et al.

portion of the premises, for the purpose of re-investing himself with the seizin, to enable himself to recover *mesne* profits, after the first disseizin, as in *Butcher v. Butcher*, 14 E. C. L. 59; and in *Taunton v. Costar*, 7 T. R. 431, the same question was involved. But none of these cases, (all of which are decided upon a mere fiction of law, that entry upon the land gives seizin from the accruing of the party's title,) afford any aid in determining the question before us. They only show, that one may lawfully resume possession of his own, when he can do it peaceably.

So, too, the universally recognized right of one in possession of his own property, and which he has the right to possess *in præsenti*, to defend his possession by such force as may be necessary to overcome the opposing force, affords no aid here. For it seems but a natural corollary from that proposition, that he, who is out of possession, cannot lawfully fight himself into even a legal possession. Such a principle seems equally at variance with the genius of our institutions, the character of our people, and the spirit of the English laws. So cautious, indeed, are the English laws of all excuse for the use of force, and so opposed to all conflict and strife, that they will not allow one, who has the right of distress, as for rent, to take, by way of distress, any animal, or other article, in the *personal use* of the debtor at the time. 1 Inst. 47 *a*, note L. This rule, it is said, has even been extended to beasts *damage feasant;* as where one rides his horse across your field, you must resort to your action for the damage. *Storey v. Robinson*, 6 T. R. 138. Lord KENYON, in giving judgment, says, "If it were permitted to a party to distrain a horse, while any person is riding him, it would perpetually lead to a breach of the peace." See, also, *Simpson v. Hartop*, Willes 512, where Ch. J. WILLES enters into a labored argument to show, that to permit a party, in any case, to make distress of articles in personal use would naturally encourage breaches of the peace, which the law can never do.

But to return to the case of *Newton v. Harland.* After the last argument, Ch. J. TINDALL said,—"If the landlord, in making his entry upon the tenant, has been guilty, either of a breach of a positive statute, or an offence at common law, it appears to me, that such violation of the law, in making the entry, *causes the possession, thereby obtained, to be illegal.*" This seems as satisfactory, and as

decisive of the question, as could be desired. And coming, as it does, from one of the most eminent judges, who ever sat in Westminster Hall, it is undoubtedly entitled to very great consideration. Bosanquet, J., said, " If the act be expressly prohibited by statute, it must, I apprehend, be illegal and void." " If the lessor enter, with a strong hand, his act is unlawful, and he cannot, as it seems to me, acquire lawful possession by an unlawful act." And this is said, it must be remembered, in regard to an entry made by a landlord upon his tenant, who was forcibly holding over against him, after his term had expired. Erskine, J., said,—"A landlord, though, under the circumstances of this case, he has a right of entry, must, in order to re-invest himself with the lawful possession of the premises held over by his tenant, exercise his right of entry *peaceably*, and he cannot found a *legal* right to remove his tenant upon the *illegal* act of a forcible possession." And he states his apprehension of the effect of such a principle obtaining general currency, as follows,—" I cannot but apprehend, that if it were once established, as law, that a landlord might in all cases, where his tenant holds over, enter by force upon the premises, and expel the tenant, and thereby expose himself to no greater risk, than the peril of an indictment for forcible entry, under which no restitution could be awarded, the peace of the country would be endangered by the frequent resort to these summary proceedings."

This is the latest *declaration* of the sense of the courts of Westminster Hall upon this subject. It is not here expressly held, that the party thus expelled is entitled to an action of trespass *qu. cl.* against the landlord. Some doubts are suggested, as to this point, by one of the judges, and Justice Coltman dissented from the majority of the court; but the majority held, in the most explicit terms, that the entry is unlawful, and subjects the landlord to fine and to restitution of possession, and to pay, in a proper action, all damages. And whether the action should be trespass *qu. cl.*, or assault and battery, &c., is immaterial, as under this declaration, if the defendant had pleaded soil and freehold, as some of the cases hold, the plaintiff might have new assigned the trespass to the person of the plaintiff, and a jury, under proper instructions, would have given much the same damages, and upon the same evidence, in whatever form the declaration is drawn. We are fully agreed in the fore-

Dustin v. Cowdry et al.

going results, and the majority of the court certainly is inclined to believe, that the declaration may be trespass *qu. cl.*, as held by Lord LYNDHURST, in *Hillary* v. *Gay*. We have no disposition to add any thing in regard to the true construction of the law, as derived from the decisions of the courts in Westminster Hall. And we think the decisions of the English courts, as to the common law, or the construction of ancient statutes, are to be regarded of paramount authority. And especially should we so regard them, when found to be in accordance with the soundest reason and the wisest policy.

In regard to the American decisions, they are doubtless to some extent conflicting. In New York the law seems to be settled in accordance with the charge of the county court, in this case. And we think, the remarks of NELSON, Ch. J., in *Jackson* v. *Stansbury*, 9 Wend. 201, highly appropriate to the enunciation of such a doctrine. He says, "This position, apparently harsh, and tending to the public disturbance and individual conflict, is abundantly supported by authority, and must be considered the law of the land,"— citing a considerable number of English authorities, none of which give the least countenance to such a proposition, and *Hyatt* v. *Wood*, 4 Johns. 150, and *Ives* v. *Ives*, 13 Ib. 235,—both of which fully sustain the proposition of the learned Chief Justice. I have not been able to find any other court, except the courts in New York, bold enough to attempt to defend such a proposition; and the language of Ch. J. NELSON shows, with how much of a blush and apology he declares it to be law.

In Massachusetts it is held, that such an entry by the landlord is unlawful, and that the tenant is entitled to an action for any injury to his person, or property, or to his family, in the appropriate form, but not in trespass *qu. cl.*, or ejectment, since his title had expired, and his right of possession against the landlord is gone. In *Sampson* v. *Henry*, 11 Pick. 379, which was an action for trespass in assault and battery, the defendant justified as the owner of a dwelling house, in which the plaintiff was forcibly holding over, after his term had expired, and the defendant put him out, using no unnecessary force; the plaintiff replied *de injuria*, and had judgment. WILDE, J., in delivering judgment, says, "Such is the claim of right set up by these pleas,—a claim manifestly opposed to the fundamental prin-

ciples of civil government. The law does not allow any one to break the peace, and forcibly to redress his private wrongs. He may make use of force to defend his lawful possession, but being dispossessed, he has no right to recover possession by force, and by a breach of the peace." *Ellis* v. *Page*, 1 Pick. 43, was trespass *qu. cl.*, and the court held the tenant entitled to reasonable notice to quit, and being forcibly turned out, without such notice, by the landlord, it was held, that he was liable in this form of action. But it is submitted, that if that form of action will lie in such a case, it will, with the same reason, in every case, where the entry is unlawful. *Moore* v. *Boyd*, 24 Maine 242, is the same case, in principle, as the last, and decided upon the authority of that case. *Brock* v. *Berry*, 13 Law Rep. 89, decided in the supreme court of Maine, is similar. *Sampson* v. *Henry*, 13 Pick. 36, decides, that, in a case like the present, trespass *qu. cl.* is not the appropriate remedy, but, in a proper form, the plaintiff may recover all the damages he has sustained. *Meader et ux.* v. *Stone*, 7 Met. 147, is of the same character. All the cases concur in giving the plaintiff, in a case like the present, a right of recovery, except only those in New York.

The reported cases in this state do not necessarily conflict with the result, to which we come in this case. *Yale* v. *Seeley*, 15 Vt. 221, is put by the court upon the ground, that the defendant was in possession of the land at the time of the conflict, and was only using force in defence of his possession, which he might lawfully do. The facts in the case might have justified a different view. But the case is only to be regarded as authority for the view of the facts taken by the court. *Hodgeden* v. *Hubbard*, 18 Vt. 504, is an action for trespass *de bonis*, assault, &c.; and the court put the case upon the ground, that the plaintiff, having obtained possession of the goods by fraud, is no more exempt from being forcibly dispossessed, than if he had taken them by force and been pursued, on fresh suit, *dum flagrante bello vel delicto*. The decision is scarcely defensible upon any other ground, and in that view has no bearing upon the present case. We have no doubt, some cases may have been decided by this court, without much examination, which would very considerably favor the view taken of the law in the county court; but those cases are not reported. It may be proper to say, the case was ruled below solely upon the authority of these cases, and against delibe-

Dustin *v.* Cowdry et al.

rate and long settled opinions. But these unreported cases are always of less authority, than one which has been reported, and this court entertain no doubt whatever, that these cases rest upon no sufficient warrant of authority, or principle, if any such have ever been decided by this court; and we are content to say, in the language of Lord BROUGHAM, in the case of *Cottle, ex parte*, decided by the House of Lords so late as 1850, 14 Eng. Jurist Rep. 655,— "No judge ought to be ashamed, after erring in judgment, to acknowledge his error; still less has a court any reason for so unseemly a reluctance to admit, that the dispensers of justice are subject to the common lot of humanity."

It may be thought by some, perhaps, that we have, in the foregoing opinion, made use of strong language, in regard to the right claimed by the defendants in this case; but our language had reference exclusively to the rule of law contended for. The conduct of the defendants seems to have been as unexceptionable as could be expected, under the assertion of the right, as they no doubt understood it. And it is not improbable, they may have been led into this misapprehension of the law by some of the more recent determinations of this court. And I would not affect to disguise my own sense of satisfaction, that a principle, which I esteem of such vital importance, should now be established; and it ought not to lessen the public confidence in the wisdom of any tribunal, because, having pursued one principle of the law, until it begins unjustly to infringe upon the integrity of the system, they seek the first opportunity, fairly presented, with just circumspection, to retrace their footsteps, and to declare their convictions of the necessity of such a retrocession, in the plainest, most unmistakeable terms, so that, in future, the rule of law may be understood by all. This thing is done much more frequently in Westminster Hall, than in our American courts, perhaps; but every where it is done, and the sooner the better, if it were to be done. But the language, which we have used in regard to the rule of law contended for, is not more severe than my Lord Chief Justice KENYON felt called upon to adopt, on a similar occasion, in delivering his judgment, in *King* v. *Wilson*, 8 T. R. 358, where the landlord and eleven assistants entered a mill and lands, when the tenant's title had expired, as would seem, and with force and strong hand put him out of possession. On demurrer to the indictment,

Dustin *v.* Cowdry et al.

Lord KENYON said,—" Whether or not these facts will be proved is another question; but if they be proved, as laid, God forbid, that it should not be an indictable offence! The peace of the whole country would be endangered, if it were not so." And in expressing his sense of the importance and necessity of maintaining the indictment, which was for a forcible entry by a landlord, under circumstances very similar to those attending the present case, that learned and urbane judge says,—By so doing, " we shall not overrule any of the cases that have been cited, and we shall give effect to a part of the law, that ought to be preserved, namely, *that no one shall, with force and violence,* ASSERT HIS OWN TITLE." The other questions in the case, we think, were correctly decided by the county court.

Judgment reversed and case remanded.

NOTE BY REDFIELD, J. If it were needful to maintain, that, under the practice, in this state, of enforcing the rights of the landlord against his tenant, whose title had expired, all apology for resort to force were removed, it would become extremely apparent by the single consideration, that twelve days is the longest term required to bring any such question to final determination, unless the defendant appeal, and in such case security for costs and the accruing rents is required to be given. The landlord, who could not brook even that delay, should be reminded, that the proprietors of large estates are the last persons, who can fairly chide the law, or who should be foremost to set an example of resort to force, in redress of wrongs even; since it is only by the rules of the municipal law, and which have been adopted from policy more than justice, and for the sake of peace and order in society, that their possessions are more extensive than those of their tenants. In a state of primitive law, where force is the arbiter of all rights, and where one's title is limited to his personal possession, and the product of his own labor, it might not be easy for them to maintain that superiority in worldly position, which is now every where cheerfully accorded to them.

It may be thought, by some, who have not been at the pains to examine the subject critically, a far-fetched inference, that the first statute against forcible entry and detainer is to be regarded as one of the great land marks of English liberty. And if the thing were merely a flourish of rhetoric, it could be no where more out of place than in these grave discussions.

But the coincidence of dates, and the testimony of contemporary history, leave no reasonable doubt, that this statute is to be regarded as one of the fruits of the resistance of the English people to the unequal and oppressive poll tax of three groats, which has rendered the *nommes de guerre* of Wat Tyler and Jack Straw familiar to the ear of every reader of English history, while the real names of the persons who figured under these appellations are altogether unknown. Hume,

Dustin *v.* Cowdry et al.

vol. 2, page 285, states in terms, that these leaders demanded a fixed rent on land, instead of the services due by villeinage, and that charters to that purpose were granted them, citing Froissart's Chronicles, *liv.* 2, ch. 77.   And the language of Sergeant Hawkins, before cited, shows, that one of the chief evils of this uncertain rent was, that it gave occasion to the landlord to expel the tenant, "under pretence of feigned titles," or by claiming that the rent was in arrear.   The tendency to relapse into this semi-barbarous state, in regard to the rights of landlords and tenants seems wonderful, when it is considered, that in this state, the legislature have never seen fit to intrust the landlord with even the right to make distress for rent in arrear, which is freely conceded in England, where they have so long denied the right forcibly to dispossess the tenant.